AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Eric Falkowski<br><br>Defendant(s) | Case No.<br>6:16-mj-1520 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  Feb. 7, 2016 and Aug. 17-20, 2016   in the county of   Osceola   in the
Middle District of Florida, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 841(b)(1)(B)(vi) | Possession with intent to distribute 40 grams or more of fentanyl. |
| 21 U.S.C. §§ 841(a)(1); 841(b)(1)(C) | Possession with intent to distribute fentanyl. |

This criminal complaint is based on these facts:

See attached.

☑ Continued on the attached sheet.

_____
Complainant's signature

Joshua Baker, DEA Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 9/7/2016

_____
Judge's signature

City and state:  Orlando, Florida    David A. Baker, U.S. Magistrate Judge
Printed name and title

**STATE OF FLORIDA**  CASE NO.: 6:16-mj-1520

**COUNTY OF ORANGE**

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Joshua Baker, being duly sworn, state the following:

### Introduction

1. I am a Special Agent with the United States Drug Enforcement Administration (DEA), Orlando District Office. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been employed by the DEA as a Special Agent since August 2009. I received 19 weeks of training at the DEA Academy at Quantico, Virginia. As a graduate of the DEA Training Academy, I have received specialized training in the areas of drug trafficking and money laundering. I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as the methods used to finance drug trafficking and launder drug proceeds. I have received extensive training pertaining to narcotics investigations and the investigation of various crimes which arise from drug trafficking activities.

3. I have been trained in the methods that drug traffickers use to distribute controlled substances and I am familiar with the means by which drug

traffickers manage, transport, and conceal the proceeds of their drug trafficking activities. I have participated in and conducted investigations of violations of various state and federal criminal laws, including violations of Titles 21 and 18 of the United States Code.

4. During my tenure with the DEA, I have participated in narcotics investigations and I am familiar with, and have participated in, all normal methods of investigation, including, but not limited to, visual surveillance, interviewing of witnesses, the execution of arrest warrants, the use of confidential informants and sources, the use of pen registers and trap and trace devices, the installation and use of GPS mobile tracking devices, and the use of electronic recording/listening devices. Also during my employment with the DEA, I have utilized court-authorized prospective cell-phone geo-location information in the investigation of narcotics offenses, have authored affidavits in support of Title III wiretap applications, and have participated in Title III wiretap investigations.

## **PURPOSE OF AFFIDAVIT**

5. This affidavit is based upon knowledge that I have acquired during an investigation of drug trafficking criminal activities committed by persons in the Middle District of Florida, the Middle District of Tennessee, and elsewhere. This affidavit is based upon my personal knowledge, training and experience as a law enforcement officer, information that I received from other law enforcement officers and agents, and information received from other investigative means to include surveillance and debriefing of a confidential informant (CI) and a source

of information (SOI). The statements contained in this affidavit are based in part on information from Special Agents of the DEA, officers of the Osceola County Investigative Bureau (OCIB), and officers of the Osceola County (Florida) Sheriff's Office (OCSO). Further, because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint, I have not included every fact or facet of the investigation known to me, only enough to establish probable cause for the issuance of a criminal complaint for Eric FALKOWKSI (FALKOWSKI).

6. Based on my training and experience and the facts as set forth in this affidavit, I believe there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) have been committed by FALKOWSKI.

## FACTUAL BASIS

7. FALKWOSKI is currently the target in a DEA-led investigation into the distribution of counterfeit prescription pills in the Middle District of Florida, and elsewhere. This investigation is being conducted jointly with the OCIB, OCSO, and the Federal Bureau of Investigation (FBI). As set forth below, FALKOWSKI is a member of a drug trafficking organization (DTO) that imports substances, to include several Schedule I, Schedule II, and Schedule III substances including, but not limited to fentanyl, butyryl fentanyl, ethylone (3,4-methylenedioxy-N-ethylcathinone), pyrrolidinovalerophenone (PVP), and testosterone, into the United States. FALKOWSKI then manufactures counterfeit prescription tablets

(in Kissimmee, Florida and Nashville, Tennessee) and distributes the counterfeit tablets to the Nashville, Tennessee area, as well as other locations in the United States.

8. On February 7, 2016, OCSO was dispatched to 2860 Nicole Avenue, Kissimmee, Florida for a report of an unattended death. The investigation revealed that Catherine Brady (Cat Brady) died of a fentanyl overdose in a bedroom of the home. Several tablets were located near Brady in the room where she was found dead. These tablets later tested positive for the presence of fentanyl.

9. While OCSO conducted their investigation, FALKOWSKI, Brady's boyfriend, was arrested for having a small baggie of fentanyl in his pocket. During the course of Brady's death investigation, a State of Florida search warrant was issued for the residence. The OCIB assisted the OCSO with the execution of the search warrant.

10. OCIB investigators located a counterfeit tablet manufacturing operation that FALKOWSKI was operating in a detached garage of the residence. In the detached garage of the residence, law enforcement officers found several tableting machines, thousands of tablets, bags of powders and several dyes used to make counterfeit tablets. Not all of the powders/tablets have been analyzed at the Florida Department of Law Enforcement (FDLE) Forensics Laboratory, but several of the drug exhibits have returned from the lab and have tested positive for fentanyl, butyryl fentanyl, ethylone (3,4-

methylenedioxy-N-ethylcathinone), pyrrolidinovalerophenone (PVP) and testosterone. Based on the investigation to date, FALKOWSKI was manufacturing counterfeit prescription tablets to look like legitimate pharmaceuticals such as Lortab, Xanax, Oxycodone and Percocet.

11. Of the exhibits submitted to the FDLE Forensics Laboratory in Orlando, Florida, that were seized, the following exhibits were analyzed and found to contain a detectable amount of fentanyl and butyryl fentanyl[1].

- Exhibit Q-21 contained a detectable amount of fentanyl and weighed approximately 18 grams.

- Exhibit Q-23A contained a detectable amount of fentanyl and weighed approximately 21 grams.

- Exhibit Q-23C contained a detectable amount of fentanyl and weighed approximately 32 grams.

- Exhibit Q-24B contained a detectable amount of fentanyl and weighed approximately 90 grams.

- Exhibit Q-40 contained a detectable amount of fentanyl and cocaine and weighed approximately 111 grams.

- Exhibit Q-43B contained a detectable amount of butyryl fentanyl and weighed approximately 542 grams.

12. Further investigation revealed that FALKOWSKI moved to Florida from Tennessee in early 2015. According to a SOI, FALKOWSKI operated a

---

[1] Butyryl Fentanyl has been classified by DEA as an analogue of fentanyl under 21 U.S.C. § 813.

5

similar counterfeit tablet operation in Tennessee, then moved to Florida because he felt law enforcement was onto his operation in Tennessee. A review of several downloaded cellular telephones revealed that FALKOWSKI shipped thousands of his counterfeit tablets to Tennessee for further distribution after he moved to Florida.

13. For example, on December 2, 2015, FALKOWSI shipped a package, via Federal Express, to Sabrina Bryant in Clarksville, Tennessee. Bryant received the package on December 3, 2015, at approximately 12:47 p.m. and informed FALKOWSKI via social media that she received the package. Later that day, Bryant was found dead at her residence of an apparent drug overdose; fentanyl was one of the drugs in her system when she died. Law enforcement recovered the Federal Express parcel, along with pills matching the pills that FALKOWSKI was known to distribute.

14. On August 10, 2016, a DEA CS, met with FALKOWSKI in Kissimmee, Florida. The CS has no criminal record and is cooperating with the DEA for his/her own financial gain. The meeting was recorded and hours of conversation between the CS and FALKOWSKI were recovered.

15. During the course of the meeting, FALKOWSKI explained, in detail, how he had manufactured pills at his residence in Kissimmee, Florida and he was sending the pills to Tennessee to be distributed. FALKOWSKI also explained how he has recently been travelling back and forth between Florida and Tennessee in order to rebuild his drug trafficking operation. FALKOWSKI

also discussed with the CS how he is moving his pill manufacturing operation back to Tennessee in the near future and that he would be able to supply the CS with counterfeit pills in Tennessee.

16. On August 17, 2016, at approximately 5:23 p.m., the CS sent a text message to FALKOWSKI asking "U already gonna have stuff for me or naw?" FALKOWSKI responded saying "I can have stuff." Later that evening, at approximately 7:23 p.m., the CS sent another text message to FALKOWSKI asking for "Xanax and Oxy" referring to the prescription medications Xanax and Oxycodone. FALKOWSKI responded stating he would be able to supply the CS with the pills and that they would cost $1.00 each. The CS ordered fifty (50) of each, Xanax and Oxycodone.

17. For several days after the order was placed, the CS and FALKOWSKI exchanged text messages discussing and planning the deal. In one exchange, the CS asked FALKOWSKI if he would be in Clarksville, Tennessee to deliver the pills to the him/her.

18. On August 20, 2016, at approximately 6:00 p.m., FALKOWSKI sent a text message to the CS, stating that he drove to Nashville, Tennessee, from Florida that day. At approximately 6:19 p.m., FALKOWSKI informed the CS, again through a text message that "I have the supplies." Several more text messages were then exchanged between the CS and FALKOWSKI, trying to schedule a time to meet and complete the drug deal. Further, at approximately 10:27 p.m., FALKOWSKI sent a text message to the CS stating, "Check your

mailbox." The CS immediately notified DEA Nashville Task Force Agent (TFA) Fredrick McClintock of the text messages and that there may be counterfeit pills in the mailbox of the CS' residence in Clarksville, Tennessee. TFA McClintock and Agent Eddie Black (19th Judicial Task Force, Tennessee) responded to the CS' residence and recovered a grocery bag outside the mailbox of the CS' residence. Within the grocery bag were two separate baggies, one containing approximately fifty (50) 3 mg pills that appeared to be Xanax and the other approximately fifty (50) pills that appeared to be Percocet. These tablets were sent to the DEA Nashville Sub-Regional Laboratory and the results indicated there was a detectable amount of fentanyl present and the tablets weighed a total of approximately 35 grams.

19. On September 4, 2016, FALKOWSKI again provided the CS with what agents believe to be counterfeit prescription pills. At approximately 3:30 p.m., the CS met FALKOWSKI in Nashville, Tennessee where FALKOWSKI provided the CS with approximately one hundred (100) tablets that appeared to be Xanax. This meeting was monitored and recorded by agents from the DEA Nashville office. During the course of this meeting, FALKOWSKI told the CS he ran out of the materials to make "Oxycodone" and only had the materials to make the "Xanax" tablets. The tablets have not been analyzed by a DEA laboratory at this time. According to agents from the DEA Nashville Office, these tablets appear to be similar to the tablets FALKOWSKI provided to the CS on August 20,

2016 that later tested positive for a mixture or substance containing a detectable amount of fentanyl.

### Conclusion and Application

20. Based on the above facts and information, I believe that probable cause exists to support the issuance of a criminal complaint for Eric FALKOWSKI for one count of possession with intent to distribute forty (40) or more grams of a mixture or substance containing a detectable amount of fentanyl on February 7, 2016, and one count of possession with intent to distribute a mixture or substance containing a detectable amount of fentanyl from on or about August 17, 2016 through on or about August 20, 2016, both in violation of 21 U.S.C. § 841(a)(1).

This concludes my affidavit.

_____
Joshua D. Baker, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
on this ___7th___ day, September, 2016.

_____
Hon. David A. Baker
United States Magistrate Judge